| | | |
|---|---|---|
| AMERICAN HOME ASSURANCE | § | |
| COMPANY, AS SUBROGEE OF | § | |
| ARCELORMITTAL TEXAS HBI LLC, | § | |
| ET AL. | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | CIVIL ACT. NO. 2:24-cv-00182 |
| | § | |
| MIDREX TECHNOLOGIES INC.; | § | |
| SIEMENS INDUSTRY, INC.; LEXICON, | § | |
| INC.; PRIMETALS TECHNOLOGIES | § | |
| USA LLC;  ALTRAD SERVICES | § | |
| LIMITED; AND ALTRAD SERVICES | § | |
| LIMITED, f/k/a ALTRAD YORK | § | |
| LININGS LIMITED, | § | **JURY TRIAL DEMANDED** |
| *Defendants.* | | |

**PLAINTIFF'S RESPONSE TO DEFENDANT LEXICON, INC.'S SECOND**
**MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiff, AMERICAN HOME ASSURANCE COMPANY, AS SUBROGEE OF

ARCELORMITTAL TEXAS HBI LLC, ARCELORMITTAL USA HOLDINGS III LLC,

AND ARCELORMITTAL HBI HOLDINGS LLC ("Plaintiff") files its Response to

Defendant LEXICON, INC.'s Second Motion to Dismiss for Failure to State a Claim.

## 1.  INTRODUCTION

Lexicon filed its first motion to dismiss, and alternative motion to for more

definitive statement (Doc.10), to which Plaintiff filed a response that sought leave to file

a more detailed, amended complaint.  With this request having been granted, and the

Second Amended Petition having been filed, Lexicon once again seeks dismissal.

Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. Nonetheless, Plaintiff's Second Amended Complaint gives a long and detailed statement of the claim, and the grounds upon with it seeks relief. Further, Lexicon has been given fair notice. In advance of bringing this lawsuit, Plaintiff retained multiple highly qualified experts to conduct an investigation into the cause of the fire, and much of the text of the Second Amended Complaint comes from the findings of these experts' investigations. The Defendants in this lawsuit were given an opportunity to participate in inspecting the failed expansion joint coordinated by Plaintiff; Defendant Midrex agreed and did participate, but Lexicon did not.[1]

Lexicon does not address head on the breadth of the allegations in the Second Amended Complaint, but instead takes a few random pot-shots at various statements by Plaintiff in the complaint, before making the conclusory argument that Plaintiff "relies on possibility pleading." Plaintiff's pleading states plausable claims and identifies multiple specific breaches of duties by Lexicon. Finally, Lexicon misconstrues and misapplies the economic loss rule, in arguing that Plaintiff's tort claims are barred. Lexicon's motion is pro forma, and should be denied.

## 2. STANDARD OF REVIEW

As this Court previously observed in an opinion pertaining to a 12(b)(6) motion to dismiss, following is the applicable standard of review:

---

[1] Doc.41-1, attached.

The test of pleadings under Rule 12(b)(6) is devised to balance a party's right to redress against the interests of all parties and the court in minimizing expenditure of time, money, and resources devoted to meritless claims. *Twombly*, 550 U.S. at 558. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Furthermore, "Pleadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). The requirement that the pleader show that he is entitled to relief requires "more than labels and conclusions[;] a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Factual allegations are required, sufficient to raise the entitlement to relief above the level of mere speculation. *Twombly*, 550 U.S. at 555. Those factual allegations must then be taken as true, even if doubtful. *Id.* In other words, the pleader must make allegations that take the claim from conclusory to factual and beyond possible to plausible. *Id.* at 557. The Court stated, "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

The Supreme Court, elaborating on *Twombly*, stated, "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In dismissing the claim in *Iqbal*, the Court stated, "It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." *Id.* at 681.

*Berlanga v. Target Corp.,* No. 2:23-CV-00218, 2023 WL 11891774, at *1 (S.D. Tex. Nov. 8, 2023). In the cited *Twombly* case, the Supreme Court stated:

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough

to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–236 (3d ed.2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"),[3] on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, *e.g.*, *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

. . . .

> In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.[4] And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56, 127 S. Ct. 1955, 1964–65, 167 L. Ed. 2d 929 (2007). Two years later in another case involving a 12(b)(6) dismissal, the Supreme Court stated:

> We turn to respondent's complaint. Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S.Ct. 1955 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S.Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.,* at 557, 127 S.Ct. 1955.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.,*

at 570, 127 S.Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556, 127 S.Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557, 127 S.Ct. 1955 (brackets omitted).

Two working principles underlie our decision in *Twombly.* First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.,* at 555, 127 S.Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.,* at 556, 127 S.Ct. 1955. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157–158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Our decision in *Twombly* illustrates the two-pronged approach. There, we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, 15 U.S.C. § 1. Recognizing that § 1 enjoins only anticompetitive conduct "effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the plaintiffs in *Twombly* flatly pleaded that the defendants "ha[d] entered into a contract, combination or

conspiracy to prevent competitive entry ... and ha[d] agreed not to compete with one another." 550 U.S., at 551, 127 S.Ct. 1955 (internal quotation marks omitted). The complaint also alleged that the defendants' "parallel course of conduct ... to prevent competition" and inflate prices was indicative of the unlawful agreement alleged. *Ibid.* (internal quotation marks omitted).

*Ashcroft v. Iqbal,* 556 U.S. 662, 677–80, 129 S. Ct. 1937, 1949–50, 173 L. Ed. 2d 868

(2009).

### 3. PLAINTIFF'S PLEADINGS PERTAINING TO LEXICON

Plaintiff pleaded the following facts and causes of action that pertain to its claim

against Lexicon:

11.     Arcelor's iron reduction plant, located in Corpus Christi, Texas, is one of the largest iron reduction plants in the world, and the largest in the United States. With a capacity of two million tons of iron production per year, this plant makes use of the Midrex process for reducing iron, turning iron ore, in the form of iron oxide pellets, into usable, useful iron by way of a gas-shaft furnace that, by application of heat and gases, removes the oxygen bound to the iron, leaving behind the now purified iron which is then turned into hot briquetted iron, an ideal feedstock for the exacting needs of the American steel industry.  As is to be expected, a process on this scale is reliant on a mixture of exceptional technology and the skill of the workers involved in the process, with every piece of the plant expected to be held to the highest standards of build quality to ensure not only a quality product but also to protect both the workers and surrounding community against the dangers inherent in such high temperature and pressure applications.

12.     This suit is brought as a result of a fire that took place on or about August 14, 2022, at Arcelor's direct reduced iron plant located at 2800 Kay Bailey Hutchinson Road, Portland, Texas 78374.  A vertical expansion joint located on the bustle gas line, an essential component in the Midrex iron reduction process, suffered a failure of the refractory material and the insulation lining the interior of the expansion joint, resulting in a rupture in the joint and a fire that necessitated an emergency shutdown of the line and ultimately the replacement of the entire joint. Following is a photograph of the bellows showing the location of the failure which lead to the gas breach:



Thankfully, quick and capable emergency work on the part of the plant's staff prevented any loss of life or damage to the surrounding area outside of the plant, but, unfortunately, the plant itself suffered significant damages that necessitated major repair. As a result, Plaintiff's insured, Arcelor, sustained significant damages. Nothing Arcelor did caused or contributed to the failure of the expansion joint joint, and Arcelor took appropriate steps to mitigate the damages caused as a result of the failure of the expansion joint.

13.     This failure resulted in total economic damages totaling $6,952,791.51 as a consequence of the property damage, interruption of business/loss of use damages, and reasonable and necessary costs to repair the plant to its ordinary working condition prior to the failure.

14.     The expansion joint, and the refractory material, insulation, and metal components within the expansion joint, were designed, manufactured, sold, and/or installed by Defendants.

15.     To provide context to Court, the object in question that failed in this incident was an expansion joint that was installed as part of the reaction furnace that is used in the production of hot briquetted iron. This is not a small part that can be easily overlooked. For reference, please see an image of the removed section of joint and compare it to the surrounding workers:



The interior diameter of the joint is approximately eight feet across, large enough for a grown man to comfortably lay down in without touching the edges. The interior of the joint was filled with refractory material, secured with anchor points, which served to protect the bellows which is on the other side of the steel ring visible in the above shot. Without the refractory material, the immense heat of the process will, slowly but surely, erode the remainder of the joint, eventually leading to a failure like the one that occurred in this case. The refractory and/or its component materials were installed by Lexicon and/or Altrad York Linings.

16.    To construct a joint like the one in this case, the refractory material must be applied to the interior of the ring. The refractory, akin to concrete, will not just stick to the side of a metal ring and thus must have something to which to anchor. This requires the joint to be constructed in stages, with each stage being a prerequisite to the next, and each stage reliant on the performance of the prior stages to function. A joint without proper assemblage of the anchoring and refractory is akin to a house built without a proper foundation and framing. While it may stay together for some time, with the owner not knowing anything is amiss, but eventually the improper construction methods used will make themselves suddenly, dramatically clear.

17.     In the present case, the blueprints for this joint called for anchor points to be affixed to the inner rings via field modification, after which refractory material in the form of medium and light weight castables were to be cast over these anchors in order to form the protective refractory ring around the interior. This field installation would have been performed by Lexicon and/or Altrad. Hex mesh along the interior would serve to further reinforce the interior surface and hold the refractory in place. The anchors were to be affixed to the ring, and the refractory cast over the anchors as the anchors cannot be installed into an already cast refractory lining. This process therefore requires proper installation of the anchors and then proper mixing and application of the refractory material into the space between the steel ring and the hex mesh. Unfortunately, this is not what happened in the present case.

18.     First, the anchors in this ring appear haphazard and uneven. In testing, once the refractory was removed to the anchors were visible, it was found that the legs were of differing lengths, and some even appeared to have been removed for purposes unexplained and not called for in the designs:



19.     Worse still was the refractory which was placed over these anchors. First, the refractory material, upon testing, did not meet the generally accepted guidelines for either medium or lightweight castable refractory material. Second, the material did not appear to be cast at all, in direct contradiction to the blueprints:



REFERENCE DRAWINGS:
F4–300—REFRACTORY LINED DUCTS—BILL OF MATERIAL AND
GENERAL NOTES
F4–331—REFORMED GAS DUCT REFRACTORY—GENERAL ARRANGEMENT—
MAIN HEADER AND BUSTLE GAS DUCT

NOTES:
1. BRUSH COAT V–ANCHORS WITH BITUMASTIC BEFORE CASTING
HOT FACE LINING OF ABRASION RESISTANT CASTABLE.
2. CASTABLE ANCHORS TO BE FIELD INSTALLED BY REFRACTORY
CONTRACTOR USING INCONEL 182 WELDING ELECTRODE OR EQUAL.
3. ALL BRICKWORK TO HAVE RING CONSTRUCTION EXCEPT
WHERE BONDING IS ABSOLUTELY NECESSARY.
4. NO CUT BRICK SMALLER THAN 2/3 THE SIZE OF THE
ORIGINAL BRICK TO BE USED.
5. All BRICK TO BE LAID USING A TROWELED JOINT.
6. ENSURE GOOD ANCHOR WELDS BY SPOT GRINDING SHELL AT
EACH ANCHOR LOCATION NO MORE THAN 48 HOURS BEFORE
WELDING IS COMPLETED.

20.     There are three ways to put refractory material in in construction, and they are not equal.  The first is casting, which is explicitly called for in the blueprints. This is where the refractory material is mixed, poured into the mold, vibrated down to fill evenly and without gaps, and then allowed to cure into a solid, consistent structure, akin to cast concrete construction in less thermally intensive applications.  In contrast, the other two methods, shotting and gunning, are less even and far more subject to errors when applied with substandard techniques.  In shotting, the refractory material is mixed ahead of time, but rather than being cast in is instead sprayed into the desired form by way of pressurized air, and comes with all the potential drawbacks of any process reliant on an even spray.  Gunning takes it a step further and mixes the powdered refractory base and water at the nozzle of the applicator gun itself, making it even more susceptible to errors as

there is no guarantee of even having an even mix of material and water as necessary for a proper cure.  As noted above, the blueprints called for casting, but all testing performed to this date has pointed to the refractory material either being shot or gunned in, in direct contradiction to the requirements.  While one can argue, and Plaintiff indeed does, that quality assurance and oversight from Midrex should have spotted such a deviation from Midrex's own plans in the construction process, that does not change the fact that the installer(s) used the wrong method, and apparently poorly so, resulting in a refractory lining so rife with errors that some sections of the material could be scraped out and ground to powder using only the bare hands of the examiners.  This is, on its face, unacceptable.  The flaws are so widespread that they even hinder testing, as core samples of this material would sometimes disintegrate as they were being extracted, leading to ongoing testing for almost a year now to attempt to ascertain the precise mechanism of failure within the known realm of a faulty install/build.

## IV.  <u>FIRST CAUSE OF ACTION: NEGLIGENCE</u>

21.     Plaintiff incorporates the allegations set forth in the previous paragraphs.

22.     The plant and/or its components were constructed in differing parts by Siemens, Lexicon, Primetals, and Altrad, operating under the instruction and guidance of Midrex.  Midrex, being the licensor of the Midrex process, provided the designs for the construction performed by both Midrex and the other four defendants.  Midrex further continued their involvement with the plant in the form of ongoing inspections which nonetheless failed to identify the defective materials installed under their watch.

23.     The negligence of Defendants, acting by and through their agents, vice-principals, and/or employees, caused the injury to Arcelor as described below.

24.     Defendants owed a duty to the general public and the owners and operators of the plant to use ordinary care in the design, manufacture, sale, warnings, and installation of the reduction plant and its component parts.  The event was proximately caused by the negligence of Defendants in failing to enact and adhere to the standards of ordinary care for a company engaged in the construction and installation of refractory materials, the adherence to which would have prevented this accident.

> When constructing a building or installing a structure, the constructor/installer owes a duty under the reasonable professional standard to use due care in the construction and/or installation.  In Texas, the state in which the construction took place, "[t]he duty owed by a professional to his client derives from their contractual relationship and requires that the

professional 'use the skill and care in the performance of his duties commensurate with the requirements of his profession.'"

*In re Capco Energy, Inc.*, 669 F.3d 274, 279 (5th Cir. 2012), *citing I.O.I. Sys., Inc. v. City of Cleveland, Texas,* 615 S.W.2d 786, 790 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). In the case of construction, this is adherence to the blueprints and plans provided and adherence to the professional standards of construction.

25.     The parties involved in the construction and installation of the joints and/or their refractory linings were Lexicon and Altrad York Linings. The construction and installation of the joints and/or their refractory linings were clearly done below the standard of care. Because of this failure, heat was able to access what should have been protected sections of the joints, leading to an erosion of the system itself which could not be detected by Complainant until such time as the joint suffered a catastrophic failure. But for the negligence of Lexicon and/or Altrad in the construction and installation of the refractory lining, this accident would not have happened, along with the resulting damages.

26.     Defendants' duties included the following:

- All Defendants had a duty to employ reasonable quality assurance methods in the manufacture of the expansion joint;

. . . .

- All Defendants had a duty to employ reasonable quality assurance methods in the construction and installation of the expansion joint;

. . . .

- All Defendants had a duty to employ precautionary procedures to prevent installation of defective materials;

. . . .

- All Defendants had a duty to properly test the application of the refractory substrate;

- All Defendants had a duty to inspect the refractory substrate;

. . . .

- All Defendants had a duty to warn the purchaser of the latent defects in the manufactured products which were not reasonably discoverable by the end user.

Defendants breached each of the foregoing duties. The breach of these duties by Defendants proximately caused the accident and the resulting damages. But for the breach of these duties to use ordinary care as a professional entity engaged in the business of plant construction and iron reduction manufacturing components, the accident would not have taken place and the damages accrued therefrom would not have been incurred.

27. Pleading further, Plaintiff would show that the conditions and/or instrumentalities involved in the incident complained of herein were under the management and control of the Defendants, and/or their agents, servants, and employees. Plaintiff would further show that the character and the event causing Arcelor's damages would not ordinarily occur in the absence of negligence and, under these circumstances, Defendants' negligence can be inferred under the doctrine of *Res Ipsa Loquitor.*

*Plaintiff's Second Amended Complaint*, Doc. 25, p.3-14.

### 4. PLAINTIFF HAS PLEADED PLAUSIBLE ALLEGATIONS OF DUTIES AND BREACH BY LEXICON

Plaintiff's primary cause of action against Defendants is for the negligent design, manufacture and/or installation of the expansion joint and its refractory material. Lexicon performed the installation of the expansion joint and its refractory components at the Corpus Christi iron reduction plant. As held in *Iqbal*, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Plaintiff's allegations satisfy the factual plausibility requirement as to the duties of Lexicon in its installation of the expansion joint and its refractory components at the plant.

The installation of the expansion joint was not a simple "bolt-in" operation. The joint is approximately eight feet in width, and its blueprint calls for the field installation

of critical components. This is a highly specialized installation that calls for a level of expertise that Lexicon purports to possess. As noted in Lexicon's website pertaining to its Industrial Constructors division: "We self-perform installation and precision alignment of process lines and heavy industrial equipment for OEM's such as SMS, MAN GHH, Danieli, Vost-Alpine, DAVY, Kvaerner Metals, ANDRITZ, FIVES, TENOVA, Midrex and many more. We've been doing it for more than for 35 years, so you can rest assured it'll be done right." https://lexicon-inc.com/service/mechanical-equipment-installation/ It is factually plausible that Lexicon would have duties as pleaded by Plaintiff in performing the installation of this massive expansion joint at a plant in Corpus Christi to a bustle gas line through which a potentially explosive product is to flow. With the foundational allegations stated above that were pleaded in the complaint, along with six bullet points specifically outlining the duties, Plaintiff has pleaded a facial plausibility claim that Lexicon breached its duties with the installation of the expansion joint and/or its refractory materials.

Lexicon apparently contends that Plaintiff's pleading does not satisfy the plausibility requirement based upon the allegation in the complaint that "the field installation would have been performed by Lexicon and/or Altrad." Doc.29, at 3. The installation of the refractory was performed by *both* Lexicon and Altrad. Plaintiff's pleading as to the joint conduct by "Lexicon and/or Altrad" does not make the allegations ambiguous. Plaintiff pleaded that the installation of the anchors in this ring appear haphazard and uneven. The anchor legs were of differing lengths, and some even appeared to have been removed for purposes unexplained and not called for in the

designs. Plaintiff pleaded that the refractory material did not meet the generally accepted guidelines for either medium or lightweight castable refractory material. Finally, the material did not appear to be cast at all, in direct contradiction to the blueprints.

Lexicon argues: "In alleging duty and breach, Plaintiff relies on prophylactic, definitionally ambiguous pleading disallowed in the Fifth Circuit. *See Petri v. Kestrel Oil & Gas Properties, L.P.,* No. CIV.A. H-09-3994, 2011 WL 2181316, at *7 (S.D. Tex. June 3, 2011)(requiring factual pleading that distinguishes plausible claims against each Defendant individually)." Doc.29, at 3. The obscure, non-reported opinion cited by Lexicon is inapplicable to this case. In that case the court, while critical of the plaintiff's pleading in the case and issuing an order to replead, does not state or cite a black letter rule prohibiting collective allegations against defendants:

> WGPS also asserts that Plaintiffs have lumped all Defendants together and collectively pleaded vague and ambiguous allegations against them, despite Defendants' having different status and/or relative positions in relation to Plaintiffs' claims. Plaintiffs fail to state sufficient facts relating to the specific conduct of WGPS and fail to give fair notice of the nature of a claim and plausible factual allegations to support any claim against each defendant. Plaintiffs generally allege negligence, gross negligence, and malice against WGPS but do not set out sufficient facts relating to the specific alleged conduct of WGPS giving rise to these claims, even though Plaintiffs recognize the applicability of the worker's compensation bar.
>
> . . . .
>
> The Court also agrees that the remaining claims against all Defendants here are not adequately pleaded under Rules 12(b)(6) and 9(b) and under Twombly and Iqbal and their progeny. Defendants have requested and are entitled to a more definite statement to provide them with adequate notice of the claims against them, as well as factual pleading distinguishing plausible claims against each Defendant individually. Moreover the Court agrees that Plaintiffs should identify the wrongful death beneficiaries or show good cause why they cannot do so.
>
> Accordingly, the Court

> ORDERS that Plaintiffs shall file within twenty days of entry of this order a
> second amended complaint that satisfies federal pleading standards.

*Petri*, at *5-7. Further, the complaint in that case pleading claims of fraud, which the court observed required a heightened standard of pleading, and the plaintiff did not file a response to the motion to dismiss. In this case, Plaintiff has made allegations and claims against Lexicon and Altrad that are segregated from its claims against Midrex and Primetals.

Next, Lexicon complains that Plaintiff "makes no allegation that Lexicon had control over Altrad's work—and Plaintiff's pleading itself leaves open the possibility that Altrad's work along cause the fire at issue." This is a strawman argument, as Plaintiff does not contend that either Lexicon or Altrad were general contractors. In fact, Midrex would be closer to general contractor status than any other defendant in this case.

Lexicon asserts that in "its Second Amended Complaint, Lexicon (sic) attempts to assert a professional duties exception to the economic loss rule by asserting Lexicon's duties in this case are professional duties derived from the 'contractual relationship' between Lexicon and its client (who Plaintiff leaves unspecified)." Doc.29, at 6. This was not Plaintiff's intent. Although Plaintiff cited a case involving professional duties, this citation was for the purpose of advocating that the duty of ordinary care is measured based on the standards of the profession under a contractor is performing its work. Immediately prior to this citation, Plaintiff pleaded that Lexicon's duty was one of ordinary care of an entity working in the construction profession, not the duty of a licensed professional: "The event was proximately caused by the negligence of

Defendants in failing to enact and adhere to the standards of ordinary care for a company engaged in the construction and installation of refractory materials, the adherence to which would have prevented this accident."  Doc.25, at 11.

### 6.  THE ECONOMIC LOSS DOCTRINE DOES NOT BAR PLAINTIFF'S DAMAGES CLAIM

**A.    The economic loss rule does not preclude tort claims between parties who are not in contractual privity.**

In citing two appellate court cases from 2000 and 2002, Lexicon begins its analysis on the economic loss rule by stating:  "Texas courts have generally applied the economic loss rule to preclude negligence claims between parties who are not in contractual privity."  Doc.29, at 5.  In 2011, the Texas Supreme Court expressly held that this is *not* an accurate summary of Texas jurisprudence:

> There are at least two problems with this analysis. First, it both overstates and oversimplifies the economic loss rule. *See, e.g., Giles v. GMAC,* 494 F.3d 865, 874 (9th Cir.2007) (noting that "many courts have stated in overly broad terms that purely economic losses cannot be recovered in tort" but "[s]uch broad statements are not accurate"). **To say that the economic loss rule "preclude[s] tort claims between parties who are not in contractual privity"** and that damages are recoverable only if they are accompanied by "actual physical injury or property damage," 277 S.W.3d at 152–53, **overlooks all of the tort claims for which courts have allowed recovery of economic damages even absent physical injury or property damage.** *See, e.g., Formosa,* 960 S.W.2d at 47; *see also* Powers & Niver, 23 Tex. Tech L.Rev. at 492 (noting that "the 'economic loss' rule has never been a general rule of *tort* law; it is a rule in *negligence* and *strict product liability*" and observing that "[p]ure economic loss is commonly recoverable in certain torts"). Among these are negligent misrepresentation, legal or accounting malpractice, breach of fiduciary duty, fraud, fraudulent inducement, tortious interference with contract, nuisance, wrongful death claims related to loss of support from the decedent, business disparagement, and some statutory causes of action.

> Moreover, **the question is not whether the economic loss rule should apply where there is no privity of contract (we have already held that it can)**, but whether it should apply at all in a situation like this. Merely because the sewer

was the subject of *a* contract does not mean that a contractual stranger is necessarily barred from suing a contracting party for breach of an independent duty. If that were the case, a party could avoid tort liability to the world simply by entering into a contract with one party. The economic loss rule does not swallow all claims between contractual and commercial strangers.

*Sharyland Water Supply Corp. v. City of Alton,* 354 S.W.3d 407, 418–19 (Tex. 2011)(emphasis added).

**B.     The economic loss rule does not preclude claims in tort for damages that are not the subject of the contract.**

Plaintiff has pleaded that the failure of the expansion joint caused damage to property other than the expansion joint itself: "Thankfully, quick and capable emergency work on the part of the plant's staff prevented any loss of life or damage to the surrounding area outside of the plant, but, unfortunately, the plant itself suffered significant damages that necessitated major repair." Doc.25, at 5. In the context of a construction case, the Texas Supreme Court has held that the economic loss rule does not bar a tort claim by a property owner against a plumbing contractor whose defective installation resulted in flooding on the premises, and damage to property other than the plumbing that the contractor installed:

> In *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 204 S.W.2d 508, 510 (1947), we observed that a common law duty to perform with care and skill accompanies every contract and that the failure to meet this implied standard might provide a basis for recovery in tort, contract, or both under appropriate circumstances. *See also Coulson v. Lake L.B.J. Mun. Util. Dist.,* 734 S.W.2d 649, 651 (Tex.1987) (reaffirming this observation). The underlying contract in *Scharrenbeck* was for the repair of a heater in the plaintiff's home. 204 S.W.2d at 509. The defendant performed his work so poorly that the house burned down. *Id.* And, a jury found that the plaintiff's loss was proximately caused by the defendant's negligence. *Id.* at 511. On appeal, the defendant argued that it had not breached any duty to the plaintiff, but this Court disagreed, holding that a "duty arose by implication" and that "[h]aving undertaken as an expert and for a consideration to repair and adjust the heater, [the repairman] owed [the

homeowners] the duty, as a matter of course, not negligently to burn their house in the undertaking." *Id.* at 510–11; *cf. LAN/STV v. Martin K. Eby Constr. Co.,* 435 S.W.3d 234, 242–43 n. 35 (stating that *Scharrenbeck,* which involved a suit by a contracting party, has been limited by subsequent cases).

The circumstances here are very similar. Having undertaken to install a plumbing system in the house, the plumber assumed an implied duty not to flood or otherwise damage the trust's house while performing its contract with the builder. Although the court of appeals views this property damage as a mere economic loss arising from "'the subject [matter] of the contract itself,'" 446 S.W.3d at 35 (quoting *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986)), and purports to apply the economic loss rule as a bar to any tort claim, the rule does not apply here.

The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy. *LAN/STV,* 435 S.W.3d at 243; *Jim Walter Homes,* 711 S.W.2d at 618. But it does not bar all tort claims arising out of a contractual setting. As we have said, "a party [cannot] avoid tort liability to the world simply by entering into a contract with one party [otherwise the] economic loss rule [would] swallow all claims between contractual and commercial strangers." *Sharyland Water Supply Corp. v. City of Alton,* 354 S.W.3d 407, 419 (Tex.2011). Thus, a party states a tort claim when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit. *See LAN/STV,* 435 S.W.3d at 242–43 (discussing the limitations on recovery of purely economic damages by contractual strangers); *DeLanney,* 809 S.W.2d at 494–95 (suggesting that the source of the duty and the nature of the wrong should be examined to determine whether the underlying claim is in tort or contract). Such was the case in *Scharrenbeck,* and such is also the case here. **The plumber's duty not to flood or otherwise damage the house is independent of any obligation undertaken in its plumbing subcontract with the builder, and the damages allegedly caused by the breach of that duty extend beyond the economic loss of any anticipated benefit under the plumbing contract.**

*Chapman Custom Homes, Inc. v. Dallas Plumbing Co.,* 445 S.W.3d 716, 718–19 (Tex. 2014)(emphasis added). Citing *Chapman*, Lexicon recognizes that "a construction contractor certainly has an implied duty to not damage other property *while* performing its work on another property." Doc.29, p.7 (emphasis original). However, Lexicon argues that there is no implied duty to perform its work in a manner that *later* results in

damage, while misstating the holding of *Chapman* as only applying to damages occurring during the contractor's work. In *Chapman*, the plumbing leaks that caused the injury suffered by the plaintiff did not occur until some time after the completion of the construction of the home:

> Chapman Custom Homes, Inc. contracted with Michael B. Duncan, trustee of the M.B. Duncan Trust, to build a home on property owned by the trust. The builder, in turn, contracted with Dallas Plumbing Company to put in the plumbing at the new house. **After the home's completion, plumbing leaks allegedly caused extensive damage to the structure.** The builder and trust sued the plumber for the damage, alleging breach of contract, breach of express warranty, and negligence. The plumber denied liability and moved for summary judgment, which the trial court granted and the court of appeals affirmed.

*Chapman Custom Homes, Inc. v. Dallas Plumbing Co.,* 445 S.W.3d 716, 717 (Tex. 2014)(emphasis added).

In 2016, the Fifth Circuit followed *Chapman* in reversing a trial court's Rule 12(b)(6) dismissal of a negligence claim based upon the economic loss doctrine:

> Turning to Plaintiffs' negligence claim on the merits, we find that the district court erred in dismissing the claim. Under Texas law, "[t]o sustain a negligence action, the plaintiff must produce evidence of a legal duty owed by the defendant to the plaintiff, a breach of that duty, and damages proximately caused by that breach." *Lee Lewis Const., Inc. v. Harrison,* 70 S.W.3d 778, 782 (Tex.2001). Nonetheless, "[a] party's conduct may often ostensibly implicate both contractual obligations and various tort duties." *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH,* 524 F.3d 676, 678 (5th Cir.2008).

> Recognizing this, Texas courts follow "[t]he economic loss rule [which] generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.,* 445 S.W.3d 716, 718 (Tex.2014) [hereinafter *Chapman (Tex.)*] (per curiam). Under this doctrine, "if the defendant's conduct ... would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract." *Sw. Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494 (Tex.1991).

However, the doctrine "does not bar all tort claims arising out of a contractual setting." *Chapman (Tex.),* 445 S.W.3d at 718. The Supreme Court of Texas has held that "a party states a tort claim when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit." *Id.* In this analysis, "[t]he nature of the injury most often determines which duty or duties are breached." *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986). If the injury "would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort." *Sw. Bell Tel.,* 809 S.W.2d at 494. Following this principle, Texas courts have held that "[t]he [economic loss] rule does not preclude tort recovery if [the injury involves] physical harm to the ultimate user or consumer or other property." *Equistar Chems., L.P. v. Dresser–Rand Co.,* 240 S.W.3d 864, 867 (Tex.2007); *see also* Restatement (Third) of Torts: Liab. for Econ. Harm § 3 cmt. b (Am. Law Inst. 2012) ("An actor whose negligence causes personal injury or physical harm to the property of another can be held liable in tort regardless of whether the negligence occurs in the performance of a contract between the parties.").

In dismissing Plaintiffs' negligence claim, the district court committed two errors. First, it relied on *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.,* 446 S.W.3d 29 (Tex.App.—Dallas 2013, pet. granted) [hereinafter *Chapman (Dall.)*] (mem. op.), to conclude that plaintiffs had not specifically pleaded a common law duty under Texas law to provide an operating top of the line commercial alarm. Second, it concluded that even "if ADT has such an obligation, it arose by contract," so the claim would be subject to the economic loss rule. On the first point, *Chapman (Dall.)* has since been overruled, and the rationale from *Chapman (Dall.)* specifically relied on by the district court has been overruled. In *Chapman,* a homeowner filed a negligence claim against a plumber "for water damage to new construction allegedly caused by a plumber's negligent performance under its subcontract with the homeowner's general contractor." *Chapman (Tex.),* 445 S.W.3d at 717. Because the intermediate appellate court was under the impression that the pleadings alleged no "violation of any duties imposed by law that were independent of the contract," it granted summary judgment on the negligence claim. *Chapman (Dall.),* 446 S.W.3d at 35. On review, the Supreme Court of Texas reiterated the economic loss rule but found that "the plumber assumed an *implied duty* not to flood or otherwise damage the trust's house while performing its contract with the builder." *Chapman (Tex.),* 445 S.W.3d at 718 (emphasis added). And this implied duty was "independent of any obligation undertaken in its plumbing subcontract with the builder, and the damages allegedly caused by the breach of that duty extend beyond the economic loss of any anticipated benefit under the plumbing contract." *Id.* at 719. *Chapman (Tex.)* demonstrates that Plaintiffs should not be faulted for failing to specifically demonstrate that a common law duty to provide an operating top of the line

commercial alarm exists in Texas because such duties may be implied by the relationship between the parties.

On the second point, the district court erred when it suggested that, in any event, Plaintiffs' negligence claim would be covered by the 1999 Contract. A reading of the 1999 Contract shows that ADT was bound by Section C of the contract to provide maintenance and repair of the alarm system.

At first glance, this suggests that the economic loss rule should preclude Plaintiffs' negligence claim. Plaintiffs alleged that ADT breached its duty to provide them with a top of the line alarm and to provide a working alarm system, a duty that appears to be covered by contract. However, under Texas law, "[t]he nature of the injury most often determines which duty or duties are breached." *Jim Walter Homes,* 711 S.W.2d at 618. While Plaintiffs assert a duty that sounds similar to the one covered by contract, the nature of Plaintiffs' injury is non-economic. Plaintiff Shakeri alleged that he suffered severe and permanent physical injuries when Neimax was robbed on January 12, 2012. Plaintiff Shakeri's injury is therefore the kind of "physical harm" that is not covered by the economic loss rule and is not defeated by the existence of a contract between the parties. *Equistar Chems.,* 240 S.W.3d at 867. Accordingly, the district court erred in dismissing Plaintiffs' negligence claim.

*Shakeri v. ADT Sec. Servs., Inc.,* 816 F.3d 283, 292–93 (5th Cir. 2016).[2] Similarly, Lexicon has an implied duty in its limited role pertaining to the refractory materials to the expansion joint and its installation, to perform its work in a manner that does not later lead to a fire that damages the plant. Notably, unlike in *Shakeri*, Lexicon has not produced a copy of a contract that it claims controls the work. Lexicon has not even alleged who were the contracting parties for its work.

This Court has previously recognized the limitations of the economic loss rule in precluding claims in tort for damages that are not the subject of the contract:

However, in evaluating the nature of the claim, the court must consider the source of the duty to act and the nature of the remedy. When the plaintiff alleges a claim based on an extracontractual duty, even when it claims damages that are

---

[2] *Shakeri* also involved an instance where the injury was sustained by the plaintiff after the contractor had completed its installation work.

only economic losses, it is no longer limited to breach of contract rules and remedies but must apply those that accompany the legal claim. The nature of the claim transforms the same economic losses that ordinarily accompany a breach of contract claim into losses sounding in tort.

*Landmark Am. Ins. Co. v. Port Royal by Sea Condo. Owners Ass'n, Inc.,* 619 F. Supp. 3d 719, 724 (S.D. Tex. 2022), *reconsideration denied sub nom. Landmark Am. Ins. Co. v. Port Royal By the Sea Condo. Owners Ass'n, Inc.,* No. 2:19-CV-00006, 2022 WL 17970201 (S.D. Tex. Dec. 27, 2022)(citations omitted).

Defendant argues, however, that even if it owed Plaintiff a duty of care, the only injury suffered by Plaintiff are contract damages, and therefore, Plaintiff's negligence action is barred by the economic loss rule. (D.E. 12 at 8.) "In determining whether the plaintiff may recover on a tort theory, it is also instructive to examine the nature of the plaintiff's loss. When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract." *Southwestern Bell Telephone Co. v. DeLanney,* 809 S.W.2d 493, 494 (Tex.1991). Plaintiff's alleged damages, however, include not only an increase in her monthly mortgage charges and potential losses to the value of her investment associated with foreclosure, but damage to Plaintiff's credit. (D.E. 1–2 at 10.) This form of damage is more akin to a personal injury and goes beyond the typical monetary losses associated with a breach of contract claim.

Accordingly, Plaintiff's negligence claim is not barred by the economic loss rule.

*Ernster v. Bank of Am., N.A.,* No. 2:12-CV-00098, 2012 WL 4798843, at *4 (S.D. Tex. Oct. 9, 2012)

Lexicon cites a recent slip opinion, *Energium Holding LLC v. Ascension Myhealth Urgent Care*, No. No. 3:21-CV-2951-S, 2024 WL 4876957, at *13 (N.D. Tex. Nov. 22, 2024) as authority for the dismissal of a negligence claim when there was no duty independent of the contract at issue in the case. However, that case did not involve a claim of negligent construction, but one "for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., unjust enrichment, and

breach of contract" which "centers around the fallout of a business relationship during the COVID-19 pandemic." *Id*, at 1. In that case, the court held that there were injuries and duties only in contract, not tort:

> Here, Defendants' injuries and Plaintiff's duty are both contractual in nature. *See Antares Reins. Co.,* 2024 WL 1195840, at *6 (noting that the economic loss rule is designed to prevent plaintiffs from doubly recovering for a contractual breach by repackaging their contract claim in tort verbiage). The only harms that Defendants identify are the cost of re-running patient samples, the use of additional testing kits for each patient, the cost of decontamination of the equipment, and damage to the equipment, each of which are recoverable as incidental and consequential damages under Defendants' breach of contract and breach of warranties counterclaims.

*Id*, at 13. Here, Arcelor's injuries and the damages claimed by Plaintiff were for injuries traditionally considered to be actionable in tort, caused by the spread of the fire.

## C. The Arcelor plant as a whole was not a completed "product."

Next, Lexicon argues that the plant as a whole was a "product", and that the expansion joint was a component part of the product, analogizing this fact pattern to a case involving a loose bolt in a plane's engine causing damage to an airplane's wing. Doc.29, at 8-9 (*citing Mid Continent Aircraft Corp. v. Curry Cty. Spraying Serv., Inc.,* 572 S.W.2d 308, 313 (Tex. 1978). However, the plant was not a "product" placed into the stream of commerce. It is real property, and Lexicon cites no cases where a court has held that the construction of a building on real property constitutes a unitary product, to which the economic loss rule applies to bar a claim against a contractor that worked on the building. Further, Plaintiff is unaware and does not allege that Lexicon played any role in the construction of any other portions of the plant, other than the installation of one or more expansion joints in the plant. Lexicon also cites *Pugh v. Gen. Terrazzo*

*Supplies, Inc.*, 243 S.W.3d 84, 92 (Tex.App.—Houston[1ˢᵗ Dist.] 2007, pet. denied).

However, in a case cited by Lexicon on page 10 of its motion, the sister Houston Court of

Appeals noted that *Pugh* was distinguishable by not involving a claim against a general

contractor or a subcontractor:

> As this procedural history makes clear, *Pugh* applied existing economic
> loss rule principles governing negligence and strict liability claims by consumers
> against the remote manufacturer of a defective product. *Id.* at 90–95; *see also
> Sharyland Water Supply Corp.,* 354 S.W.3d at 415–18. *Pugh* did not analyze the
> viability of claims asserted against a general contractor or a subcontractor. *Pugh,*
> 243 S.W.3d at 87 n. 2 & 90–95. *Pugh* concluded that the economic loss rule
> foreclosed the homeowners' negligence and strict liability claims against product
> manufacturer General Terrazzo—even in the absence of privity between them—
> because "there was no personal injury or damage to other property that would
> have permitted the Pughs to assert a tort claim that would be excepted from the
> economic loss doctrine." *Id.* at 94 (citing *Am. Eagle Ins. Co. v. United Techs.
> Corp.,* 48 F.3d 142, 145 (5th Cir.1995), *Hininger v. Case Corp.,* 23 F.3d 124, 127
> (5th Cir.1994), and *Murray v. Ford Motor Co.,* 97 S.W.3d 888, 891 (Tex.App.-
> Dallas 2003, no pet.)).

> In contrast to *Pugh,* Barzoukas does not aim his negligence and negligent
> misrepresentation claims at the remote manufacturer of an allegedly defective
> product. Barzoukas's claims involve Smith's asserted professional negligence in
> connection with approval of foundation piers that are shorter than the depth called
> for by the original plans and specifications. Thus, we must address a different
> question that was left open in *Sharyland* by addressing whether—in the particular
> home construction circumstances presented here—the economic loss rule
> "precludes recovery completely between contractual strangers in a case not
> involving a defective product...." *See Sharyland Water Supply Corp.,* 354 S.W.3d
> at 418. *Pugh* does not answer this question.

*Barzoukas v. Found. Design, Ltd.,* 363 S.W.3d 829, 836–37 (Tex.App.—Houston[14ᵗʰ

Dist.] 2012, pet. denied).    Additionally, the *Pugh* opinion from the Houston Court of

Appeals predated the Texas Supreme Court cases in *Sharyland Water Supply Corp. v.

City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011) and *Chapman* that addressed the

economic loss rule in detail, and as such is limited in its precedential value.  Lexicon then

cites *Golden Spread Elec. Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*, 954 F.3d 804, 812 (5th Cir. 2020)) in support; however, that case involved damages just to the turbine generator installed by the defendant in that case, and not to any other portion of the power generation facility. The court recognized that the rule would not apply if the defective product had other property at the power station where the turbine generator malfunctioned:

> Physical damage is generally recoverable in tort, but a defective product causing damage to itself is not enough—the economic loss rule still limits recovery for such damage to contract. *See LAN/STV*, 435 S.W.3d at 241, n.33; *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 867 (Tex. 2007). This is because "damage to the product itself is essentially a loss to the purchaser of the benefit of the bargain with the seller," recoverable in contract rather than tort. *Mid Continent Aircraft Corp. v. Curry Cty. Spraying Serv., Inc.*, 572 S.W.2d 308, 313 (Tex. 1978). If, however, the defective product damages other property, the economic loss rule does not bar recovery in tort for those damages. *See Signal Oil & Gas Co. v. Universal Oil Prod.*, 572 S.W.2d 320, 325 (Tex. 1978) (allowing recovery in tort when a reactor heater exploded and damaged "other property in the area").

*Golden Spread Elec. Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*, 954 F.3d 804, 808–09 (5th Cir. 2020)

Finally, in *Sharyland* (a seminal case which Lexicon fails to cite in its motion), the Texas Supreme Court observed the their application of the economic loss rule has been limited to only two types of scenarios:

> Thus, we have applied the economic loss rule only in cases involving defective products or failure to perform a contract. In both of those situations, we held that the parties' economic losses were more appropriately addressed through statutory warranty actions or common law breach of contract suits than tort claims. Although we applied this rule even to parties not in privity (*e.g.* a remote manufacturer and a consumer), we have never held that it precludes recovery completely between contractual strangers in a case not involving a defective product—as the court of appeals did here.

*Sharyland*, 354 S.W.3d at 418.

**D.      There is no expansion of the economic loss rule to automatically preclude claims by "sophisticated, commercial actors."**

Lexicon cites *BlackHawk Paving, Inc. v. CPCM, LLC,* No. 4:20-CV-48-SDJ, 2021 WL 1152836, at *1 (E.D. Tex. Mar. 26, 2021) for the proposition that "Texas enforces a robust economic loss rule to prevent parties from using artful pleading to recast contract claims as tort claims." *BlackHawk* involved a case where the plaintiff already received a default judgment on its claim for breach of contract.  The district court judge granted in part and denied in part the recommendation of the magistrate judge, holding that the plaintiff was entitled to a default judgment for breach of contract, but not for fraud and misrepresentation.  The opinion does not detail any specifics as to the factual background for the claims.

Lexicon implies that the *Barzoukas* case holds that economic loss rule cases have different applications in the residential homeowner v. commercial construction contexts, due to "particular home construction circumstances."  Doc.25, at 10.  However, the case has no such holding.  In fact, the court expressly declined to address risk allocations: "Perhaps other risk allocation mechanisms exist. Perhaps not. At this juncture, any discussion of risk allocation among entities involved in the construction of Barzoukas's house is speculation based on a threadbare record."  *Barzoukas*, 363 S.W.3d at 838.  In holding that the economic loss rule did not apply, the court concluded:

> *Sharyland* demonstrates that the mere presence of contracts in the general vicinity of a construction dispute does not justify indiscriminate invocation of the economic loss rule. See *Sharyland Water Supply Corp.,* 354 S.W.3d at 418–21. The economic loss rule's reach depends on specific circumstances. *See id.* These circumstances may include risk allocations in a chain of contracts that affect

whether negligence claims seeking particular damages against particular parties are viable in connection with a construction dispute in particular circumstances. *See id.* at 420–21. No such allocations have been identified here.

*Id.* Similarly, while arguing (with little or no foundation) that Plaintiff's insureds were "sophisticated, commercial actors", Lexicon introduces nothing in the way of "risk allocations in a chain of contracts" for this Court to rely upon in evaluating a 12(b)(6) dismissal motion.

Lexicon also cites *Golden Spread* for its sophistication argument. Lexicon argues: ". . . . Plaintiff's insureds are sophisticated, commercial actors that could and should have negotiated an appropriate allocation of risk." Doc.29, at 10. The court in *Golden Spread* found that the contract between the parties expressly controlled the allocation of risk between the parties, and as such only contractual remedies were available. "For those reasons, we believe that the Texas Supreme Court would conclude that the risk suffered here is better addressed in contract than in tort. The parties are sophisticated, commercial actors that actually did negotiate over the allocation of risk." *Golden Spread,* 954 F.3d at 812. In this case, however, there is no allegation, by either Plaintiff or Lexicon, that there was a contract in place between Plaintiff's insureds and Lexicon. Further, the *Golden Spread* case involved a review of a trial court's summary judgment, after discovery had taken place, and the contract between the parties was properly before the court.

In this case, Lexicon improperly attempts to recast Plaintiff's tort claim in contract, despite the fact that no party has provided any specifics as to an alleged contract. Of course, should there be a contract that Lexicon contends bars Plaintiff's claims, a denial of Lexicon's 12(b)(6) motion at the inception of the case would not

preclude its ability to bring a motion for summary judgment based upon the contract's terms at a later date.

## 7. PRAYER

WHEREFORE, Plaintiff respectfully requests that Lexicon's motion to dismiss be denied; and for such other and further relief as just.

Respectfully submitted,

  */s/ Loren R. Smith*
Loren R. Smith
State Bar No. 18643800
Southern District No. 13282
smith@kellysmithpc.com
**KELLY, SMITH & SCHMIDT, P.C.**
12621 Featherwood Dr., Ste. 150
Houston, Texas 77034
Telephone: (713) 861-9900
Facsimile: (713) 861-7100
**LEAD COUNSEL**

*/s/ Laura D. Schmidt*
Laura D. Schmidt
SBN: 22142300
Southern District No: 593356
KELLY, SMITH & SCHMIDT, P.C.
12621 Featherwood Dr., Ste. 150
Houston, Texas 77034
(972) 848-7300
(713) 861-7100
schmidt@kellysmithpc.com
**ATTORNEYS FOR PLAINTIFF AMERICAN HOME ASSURANCE COMPANY, AS SUBROGEE FOR ARCELORMITTAL TEXAS HBI LLC AND ARCELORMITTAL USA HOLDINGS III LLC**

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 5(b)(2)(e)(E), this document has been served on all counsel of record on the 16th day of December, 2024, via the court's e-filing system. I have verified that all counsel of record are registered with the Court's ECF.


abell@zgblaw.com
Alex Johnathan Bell
**ATTORNEY FOR DEFENDANT**
**MIDREX TECHNOLOGIES INC**.

aclark@andrewsmyers.com
Andrew James Clark
tross@andrewsmyers.com
Timothy Christian Ross
**ATTORNEYS FOR DEFENDANT**
**LEXICON, INC.**


ctrent@trent-law.com
Thomas Christopher Trent
**ATTORNEY FOR DEFENDANT**
**PRIMETALS TECHNOLOGIES USA LLC**


*/s/ Loren R. Smith*
Loren R. Smith